**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLANIA**

| | | |
|---|---|---|
| **DANIEL WARREN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 16-643** |
| | : | |
| **PRIME CARE MEDICAL INC.,** *et al.* | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

**Rufe, J.** **December 20, 2019**

Plaintiff Daniel Warren filed this civil action pursuant to 42 U.S.C. § 1983 and

Pennsylvania law to recover damages for injuries he suffered at the Lehigh County Jail ("LCJ").

Warren alleges that the Defendants violated his rights through their detection, treatment, and

prevention of his Methicillin-Resistant Staphylococcus Aureus ("MRSA") infection. Defendants

PrimeCare Medical, Inc. and Dr. Deborah J. Wilson ("PrimeCare Defendants") and Corrections

Officers Jennifer Sanchez and Kurt Stametz ("Officer Defendants"), who are the remaining

defendants in this case, have each filed a motion for summary judgment. The PrimeCare

Defendants' motion will be granted and the Officer Defendants' motion be granted in part and

denied in part for the reasons set forth below.

## I. FACTUAL BACKGROUND[1]

Plaintiff developed MRSA while he was a pretrial detainee at LCJ. MRSA is:

> [A] drug-resistant strain of staph bacteria. MRSA is only susceptible to a limited
> number of antibiotics, but most MRSA skin infections can be treated without
> antibiotics by draining the sores. MRSA can be spread through direct contact with
> infected individuals or through contact with materials that have been exposed to
> the bacteria. Conditions frequently associated with corrections facilities—

---

[1] The facts of this case are hotly disputed. In this factual background, the Court will detail both Plaintiff and
Defendants' version of the facts, though, of course, when evaluating the arguments on the merits, the Court will
view the facts in the light most favorable to Warren and make every reasonable inference in his favor. Unless stated
otherwise, the factual background is drawn from the parties' briefs in support and opposition to summary judgment.

including overcrowding, shared facilities, and close contact between inmates—can increase the risk of spreading. Unsanitary conditions can exacerbate the problem.[2]

PrimeCare contracted with Lehigh County to provide medical services to inmates incarcerated at LCJ. To address the risk of MRSA, LCJ and PrimeCare adopted policies that required both medical and non-medical staff, as well as prisoners, to follow procedures for the prompt detection and treatment of the disease.[3] These procedures included warnings that MRSA could be misdiagnosed as a spider bite.[4]

### A. CO Sanchez and PrimeCare's Initial Delay in Providing Medical Care

On the evening of July 12, 2015, Warren noticed a large pus-filled blister developing on his right calf. CO Sanchez alleges that Warren told her that he had been bitten by a spider. She asserts that, in response, she twice called PrimeCare, and each time PrimeCare informed her that Warren needed to complete a sick call slip in order to be seen by the medical unit but that Warren refused to fill out a sick call slip.[5]

Warren disputes CO Sanchez's retelling of the events. He alleges that, based on the materials he had received during his intake, on warnings he received from other inmates who saw his blister, and from a comparison of his blister to pictures of MRSA posted on the walls, he reported to CO Sanchez that he had contracted MRSA and requested that she immediately contact the medical unit. Warren further alleges that CO Sanchez independently decided that the blister was only a spider bite and decided not to call PrimeCare.

However, Warren alleges that he persisted, and eventually, CO Sanchez called PrimeCare

---

[2] *Stewart v. Kelchner*, 358 F. App'x 291, 292 n.1 (3d Cir. 2009) (quoting *Kaucher v. County of Bucks*, 455 F.3d 418, 421 (3d Cir. 2006)).

[3] Doc. No. 120-11.

[4] *See id.* at 2.

[5] Doc. No. 121-4 at 116:10-22.

and told the responding medical staff member that Warren had a spider bite, that he refused to fill out a sick call slip, and that he did not need to be seen. CO Sanchez never told PrimeCare that Warren believed he had contracted MRSA. Warren attempted to protest this account but Officer Sanchez told him to "step away" from her podium.[6] Several hours later, Warren tried again to persuade CO Sanchez to take him to medical to no avail.

According to Warren, later than night, two separate correctional officers noticed the condition of Warren's leg and called the PrimeCare medical staff and described Warren's symptoms.[7] However, the PrimeCare staff refused to see Warren because he had failed to submit a sick call slip.

Warren asserts that PrimeCare and CO Sanchez's refusal to treat Warren based on his failure to complete a sick call slip had no basis in any policy. Rather, for an emergency medical problem[8] or for a skin condition,[9] Warren explains that he was only required to notify corrections staff. Moreover, Warren explained that he did not want to submit a sick call slip because there was no way to know how long it would take for the slip to be picked up and he needed immediate medical attention.

Warren avers that, the next day, a sergeant intervened and demanded that PrimeCare see Warren and treat him. At this point, Warren asserts that he was unable to apply pressure to his leg and had difficulty walking on his own.

### B. PrimeCare's Initial Treatment

At approximately 11:30 a.m. on July 13, 2015, Warren was taken to the medical

---

[6] Doc. No. 120-2 at 114:8.

[7] *See id.* at 125:23-126:4, 131:17-134:11; Doc. No. 18.

[8] Doc. No. 120-14 at PCM00164.

[9] Doc. No. 120-5 at 40:11-41:11, 61:10-63:4, 67:19-69:24, 71:1-11 (Dr. Wilson explaining that inmates do not need to fill out sick call slips to be seen when they are complaining of MRSA).

department. PrimeCare prescribed several medications for Warren, including Tylenol and Clindamycin, an antibiotic, for what they deemed to be possible cellulitis.[10] PrimeCare also assigned him crutches because he was having trouble walking. However, Warren alleges that PrimeCare failed to take the appropriate steps to identify that Warren had contracted MRSA. PrimeCare did not culture Warren's blister. It did not fill out a "MRSA form" which is required when an inmate presents a wound, a pimple, or a boil.[11] Warren was not placed in medical isolation, which Warren asserts is mandated by LCJ policy when an inmate has MRSA symptoms.

Warren alleges that, each of the next two days, he returned to the medical unit because his condition had progressively worsened—his leg had become more swollen and he could barely function. However, PrimeCare still did not culture his blister or place Warren in medical isolation. Instead, PrimeCare took away Warren's crutches.

The next day, on July 16, Warren alleges that his condition had deteriorated to the point that he actually believed that he was dying. He had an extremely high temperature and was drifting in and out of consciousness. His bed was soaked from cold sweats, pus and blood oozed from his wound, and he looked like the "elephant man."[12] At the urging of other inmates, a corrections officer called PrimeCare and requested that Warren be seen. Several hours later, PrimeCare took Warren to the medical unit in a wheelchair. Shortly thereafter, PrimeCare sent Warren to the emergency room at St. Luke's Hospital.

At St. Luke's, Warren's wound was immediately cultured and the culture confirmed that Warren had MRSA. By this time, Warren alleges that his MRSA had spread from a 5x5 inch

---

[10] Doc. No. 120-21 at PCM00022.

[11] Doc. No. 120-5 at 44:19-46:4.

[12] Doc. No. 120-2 at 212:1-14.

patch on his right calf all the way to his groin.[13] Warren remained at St. Luke's for five days where he was treated for MRSA and underwent surgery in order to drain his abscess.

PrimeCare asserts that its actions were appropriate and met the standard of care. It has presented expert witness reports which opine that the prescribed medications were appropriate under the circumstances. PrimeCare further disputes that Warren's wound worsened from when he was first seen and, instead, maintains that the swelling steadily improved and that his temperature was within normal limits.

PrimeCare further maintains that it was not until the evening of July 16, 2015, that Warren's condition changed. PrimeCare states that, at this point, Warren had swelling from his ankle to knee and he had a fever.[14] While he was in the medical department, the swelling and temperature increased. PrimeCare then ordered that Warren be taken to the hospital.

### C. PrimeCare Defendants' Care for Warren After His Return from the Hospital

Warren's discharge instructions provided by St. Luke's Hospital on July 21, 2015 included, "Pack RLE wound with 1in plain packing and cover with 4x4 and wrap with kerlex. Change dressing 2-3 times daily."[15] Packing involved placing long strips of gauze directly into Warren's open wound to keep the wound open and allow for drainage.

Warren alleges that the St. Luke's staff lightly packed Warren's leg wound with care so as to not hurt him and to ensure that the wound would properly heal.[16] Warren further alleges that St. Luke's sent discharge instructions to LCJ and PrimeCare including how to properly pack

---

[13] Doc. No. 120-2 at 245:2-13.

[14] Doc. No. 121-5 at PCM00119.

[15] *See id.* at PCM00607.

[16] Doc. No. 120-2 at 219:9-24.

the wound.

Three days after his discharge, Dr. Wilson first examined Warren, who asserts that Dr. Wilson brought together the nurses who were in the medical unit that day to instruct them to "alter the wound packing procedure" by packing the wound "tightly," which "was intentionally calculated to maximize Warren's pain and prevent his wound from healing."[17] Warren alleges that despite his continued pleas that they pack the wound less tightly, Dr. Wilson and the PrimeCare medical staff continued with the painful method of packing for weeks.[18]

Although most treated MRSA wounds heal within ten days, on August 13, 2015, Warren saw Dr. Wloczewski, another physician employed by PrimeCare at LCJ. Dr. Wloczewski made an appointment for Warren with a wound specialist at Sacred Heart because the wound was not healing "as well as [he] thought it should."[19] According to Warren, following this meeting, Dr. Wloczewski instructed Dr. Wilson and the nurses to pack the wound lightly so that it could properly heal.[20]

On August 21, 2015, Warren was examined by Dr. Hortner at Sacred Heart Hospital. Dr. Hortner gave instructions upon Warren's discharge to take care that Warren's wound not be packed too tightly.[21] Dr. Hortner also had Warren's calf cultured which confirmed that Warren had again contracted MRSA. Just one week after Dr. Hortner's initial examination, Warren saw

---

[17] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 13-14. According to Warren, Dr. Wilson took the wooden Q-tip used to pack the wound and jammed the gauze down into Warren's leg ripping open the healing that had already occurred and causing blood to run down his leg. Warren states that he shrieked in pain and pleaded with Dr. Wilson to not pack the wound so tightly, explaining that that was not how the nurses at St. Luke's treated his wound. *See id.*

[18] Doc. No. 120-2 at 232:8-17.

[19] Doc. No. 120-24 at 17:21-18:5, 21:4-22:12.

[20] Doc. No. 120-2 at 231:16-18.

[21] Doc. No. 121-6 at 29:8-14.

Dr. Hortner again, who concluded that Warren's wound had healed and closed.[22] Warren asserts that his quick recovery following his visit with Dr. Hortner was a direct result of Dr. Hortner's instructions that PrimeCare should not pack the wound too tightly.

PrimeCare disputes Warren's account. PrimeCare alleges that Warren's wound had to be packed tightly so that no pockets could form within the wound. PrimeCare also states that there is no indication in the medical notes that Dr. Wilson instructed the nurses on how to pack the wound and that it is implausible that all nine nurses who eventually packed the wound happened to be with Dr. Wilson when she allegedly gave those instructions. Furthermore, PrimeCare asserts that Dr. Hortner only gave instructions that Warren's wound not be packed too tightly because Warren had complained—it was not based on his own determination that PrimeCare's method of packing was harming Warren.

### D. CO Stametz and PrimeCare's Decision to Transfer Warren to a New Cell

As a result of his MRSA, upon his release from St. Luke's, Warren was housed in the medical isolation unit. Although Warren still had an open wound by mid-August 2015, he alleges that, at some point after his release from St. Luke's, a culture of his wound tested negative for MRSA. Warren asserts that on August 17, CO Stametz, the housing unit officer, attempted to transfer Warren to share a cell with LP, an inmate with active MRSA, because another inmate was being transferred for medical isolation and needed to be placed in Warren's cell. Warren objected and explained to CO Stametz that, although he was negative for MRSA, his wound had not yet healed and was still open, and he could contract MRSA from the other inmate if moved into the cell with him. CO Stametz initially ignored Warren's protestations but eventually he called PrimeCare. After the call, CO Stametz revised his plan and moved LP to a new cell and

---

[22] *See id.* at 44:5-7.

then immediately moved Warren into the cell just vacated by LP.

Warren further avers that LCJ's policy required corrections officers to sanitize medical isolation cells before transferring a new inmate in, and that after the cell is sanitized with a "staph attack," the cell is left "dormant."[23] Furthermore, the housing unit officer "must complete and submit an incident report to the Shift Commander explaining the reason for the move."[24] Warren asserts that CO Stametz did not sanitize the cell and did not either complete an incident report. Therefore, Warren maintains that his re-infection with MRSA, diagnosed by Dr. Hortner, was a result of being placed in the unsanitized cell.

CO Stametz disputes that LP had MRSA, and also asserts that, even though he could not recall sanitizing the cell, Warren would not have been placed in an unsanitized cell because that was against procedure.

## II. LEGAL STANDARD

"The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[25] A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[26] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[27] A dispute is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving

---

[23] Doc. No. 120-4 at 41:21-43:4, 51:2-5; Doc. No. 120-27 at 7.

[24] Doc. No. 120-27 at 8.

[25] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[26] Fed. R. Civ. P. 56(a).

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

party."[28]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[29] Further, a court may not weigh the evidence or make credibility determinations.[30] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[31] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[32] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[33]

## III. DISCUSSION

After motions to dismiss were decided by the judge to whom the case was previously assigned, the following claims remain in the case:

> (1) the § 1983 claims for violations of the Due Process Clause of the Fourteenth Amendment against Defendants Sanchez and Stametz; (2) the state law claims for negligence and negligent infliction of emotional distress against Defendants Sanchez, Stametz, Wilson, and PCM; and (3) the punitive damages claims against Defendants Sanchez and Stametz for their alleged violations of § 1983.[34]

With regard to Warren's federal claims, CO Stametz argues that summary judgment should be granted because: 1) Warren failed to exhaust his administrative remedies; and 2) Warren cannot establish that CO Stametz violated his constitutional rights. CO Sanchez also argues that

---

[28] *Id.*

[29] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

[30] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1988).

[31] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[32] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

[33] *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[34] Doc. No. 67 at 24.

summary judgment should be granted on Warren's federal claims against her because Warren cannot establish that she violated his constitutional rights. Both CO Stametz and CO Sanchez further argue that Warren's state tort claims are barred by the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"). The PrimeCare Defendants move for summary judgment on the basis that, pursuant to state law, Warren was required to submit expert reports demonstrating that the PrimeCare Defendants violated the applicable standard of care, and that this violation caused Warren's injuries.

### A. Officer Defendants

#### 1. Whether Warren exhausted all administrative remedies available to him

The Prison Litigation Reform Act of 1995 ("PLRA") requires that inmates exhaust all prison grievance procedures before suing in court.[35] The "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge."[36] The Third Circuit has explained that exhaustion requires "substantial compliance with the prison's grievance procedures."[37] "If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment. If there is a genuine dispute of material fact related to exhaustion, then summary judgment is inappropriate[.]"[38]

Warren testified in his deposition that on September 16, 2015, he filed a grievance regarding CO Stametz's alleged actions but never received a response.[39] Warren further asserts

---

[35] 42 U.S.C. §1997e(a).

[36] *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010).

[37] *Small v. Camden Cty.*, 728 F.3d 265, 272 (3d Cir. 2013) (citations omitted).

[38] *West v. Emig*, No. 18-3806, 2019 WL 5061417, at *2 (3d Cir. Oct. 9, 2019).

[39] Doc. No. 120-29; Doc. No. 120-2 at 171:2-181:21. On July 29, 2015, Warren filed a grievance with LCJ complaining that CO Sanchez denied and delayed adequate medical treatment of his serious medical condition, in contravention of LCJ policies and Officer Sanchez's training. Warren received a copy of the grievance signed by the grievance coordinator and also received a decision denying the grievance. Doc. No. 120-28. Thus, CO Sanchez does not dispute Warren exhausted his claims against her.

that before he filed the grievance, CO Stametz would not give him a grievance form and worked to thwart his ability to file a grievance by claiming that there were no grievance forms on the block.[40] Warren further states that on November 9, 2015, he filed a second grievance noting that he had never received a response to his September 2015 grievance.[41] However, by this point, Warren had been transferred to a different facility and the grievance was returned to him.[42] Warren alleges that he also filed at least two other grievances to which he never received a response, including one that expressly named CO Stametz.[43]

CO Stametz responds with a number of arguments, including that there is no evidence that Warren actually filed the September 16 grievance form and that, even if the September 16 grievance form was filed, it was procedurally deficient.[44] In his reply brief, CO Stametz supplements this argument with an affidavit filed from the then-Grievance Coordinator at the Lehigh County Jail who testified that the internal records do not show a grievance filed by Warren with regard to this incident.[45]

There is a genuine dispute of material fact as to whether Warren exhausted the administrative procedures. The Third Circuit has explained that a "conflict between the Prison's records and [the prisoner's] deposition testimony" creates "a genuine issue of material fact"

---

[40] Doc. No. 120-2 at 180:20-181:23.

[41] Doc. No 120-30.

[42] Doc. No. 120-2 at 172:23-173:3.

[43] *See id.* at 171:12-21.

[44] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 4. The Officer Defendants also argue that prisoners obtain blank grievance forms from Case Managers, not from housing unit officers like Stametz, and therefore, Stametz refusing to provide Warren with a grievance form could not have rendered the process unavailable to him, and also that the unavailability of grievance forms on one occasion does not mean that the grievance process was permanently unavailable to Warren. *See id.* at 4-5. However, because the Court finds that there is a genuine dispute of material fact whether Warren filed grievance forms without response, the Court will not decide whether there is a genuine dispute as to these latter two arguments.

[45] Doc. No. 122-2 at 4.

when the prisoner "sets forth specific facts" regarding whether they exhausted their claim.[46]

That is the case here. Warren specifically testified that he filed the September 16 grievance form,[47] that he filed several other grievances to which he never received a response, and that his attempts to follow up on those grievances after being transferred to a new facility were "returned to sender."[48] A prison "render[s] its administrative remedies unavailable . . . "when it fail[s] to timely (by its own procedural rules) respond to [the prisoner's] grievance[.]"[49] Therefore, based on Warren's sworn testimony, summary judgment on the issue of exhaustion is not appropriate because there is a genuine dispute of material fact as to whether the prison's grievance procedures were available to Warren.[50]

### 2. Whether CO Sanchez or CO Stametz violated Warren's constitutional rights

"Section 1983, enacted as part of the Civil Rights Act of 1871, establishes a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights."[51] The Constitution requires that "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"[52] Therefore, the Supreme Court has established that prison

---

[46] *Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)).

[47] Doc. No. 120-2 at 171:2-173:25; *see also Paladino*, 885 F.3d at 210 ("Indeed, it is not unheard of for a grievance form to be lost.").

[48] Doc. Nos. 120-29, 120-30, 120-31.

[49] *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 154 (3d Cir. 2016).

[50] Even if the September 16 grievance form were procedurally defective, there is still a genuine issue of material fact based on the other grievance forms that Warren testified about in his sworn deposition.

[51] *Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007) (citations omitted). The Officer Defendants do not dispute that they were acting under color of state law. Therefore, the Court's inquiry is limited to determining whether Warren was deprived of a constitutional right.

[52] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)).

officials violate the Constitution by "intentionally denying or delaying access to medical care"[53]—as Warren alleges CO Sanchez did—or by failing to "provide humane conditions of confinement"—as he alleges CO Stametz did.[54]

Typically, delay of medical care and conditions of confinement claims are asserted under the Eighth Amendment's prohibition on cruel and unusual punishment.[55] However, because Warren was a pretrial detainee, his "claim should be evaluated under the Due Process Clause of the Fourteenth Amendment, as opposed to the Eighth Amendment."[56] Nevertheless, because the "the Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment protections available to a convicted prisoner,"[57] the Court will evaluate Warren's § 1983 claims "under the same standard used to evaluate similar claims brought under the Eighth Amendment."[58]

Under the Eighth Amendment, the deliberate indifference standard—consisting of two

---

[53] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

[54] *Farmer*, 511 U.S. at 832.

[55] *See Edwards v. Northampton Cty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (conditions of confinement); *Pearson*, 850 F.3d at 534 (delay of medical care).

[56] *Id.* (citing *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005)).

[57] *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 581 (3d. Cir. 2003) (citation and internal quotation omitted).

[58] *Moore v. Luffey*, 767 F. App'x 335, 340 (citing *Natale*, 318 F.3d at 581-82); *see also Edwards*, 663 F. App'x at 135. As Chief Judge Sánchez recently explained, "[t]he standard in the Third Circuit for evaluating a pretrial detainee's claim . . . under the Due Process Clause is not entirely clear." *McFadden v. Dalmasi*, No. 17-5787, 2019 WL 6218220, at *6 (E.D. Pa. Nov. 21, 2019) (appeal filed *McFadden v. Dalmasi*, No. 19-3823 (3d. Cir. 2019)). Some courts have stated that the appropriate standard is "whether the conditions of confinement (or here, inadequate medical treatment) amounted to punishment prior to an adjudication of guilt," *Montgomery v. Ray*, 145 F. App'x 738, 740 (3d Cir. 2005) (citing *Hubbard*, 399 F.3d at 158); *see also Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979), while others have "continued to evaluate medical care claims by pretrial detainees under the Eighth Amendment standard." *McFadden*, 2019 WL 6218220, at *6 (citing *Hubbard*, 399 F.3d at 166 n.22); *see also Moore*, 767 F. App'x at 340 (citing *Natale*, 318 F.3d at 581; *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 668 (3d Cir. 1988)) ("Pretrial detainees may assert Section 1983 claims for inadequate medical care under the Fourteenth Amendment's substantive due process clause."). However, because the parties have argued the motions pursuant to the Eight Amendment standard, "the Court applies that standard for the purposes of these motions." *Id.*

conditions that a prisoner must meet—applies to both claims. First, the prisoner must show that the alleged deprivation was objectively serious.[59] When the claim is based on the denial of medical care, the inmate must show that the medical "needs were serious."[60] When the conditions of confinement claim is "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."[61] Second, the inmate must make a subjective showing that the defendants acted with "'deliberate indifference' to inmate health or safety."[62] In addition, "to survive summary judgment . . . a plaintiff is required to produce sufficient evidence of . . . causation."[63]

Neither CO Sanchez nor CO Stametz disputes the first requirement.[64] Therefore, the Court must determine whether Warren has produced sufficient evidence that: 1) either corrections officer acted with deliberate indifference; and 2) that the actions caused injury to

---

[59] *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (conditions of confinement); *Moore*, 767 F. App'x at 340 (quoting *Pearson*, 850 F.3d at 534) (delay of medical care).

[60] *Moore*, 767 F. App'x at 340 (quoting *Pearson*, 850 F.3d at 534); *see also Easterling v. City of Newark, New Jersey,* 778 F. App'x 80, 83 (3d Cir. 2019).

[61] *Farmer*, 511 U.S. at 834 (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)); *see also White v. New Jersey*, 514 F. App'x 258, 261 (3d Cir. 2013).

[62] *Id.* (citing *Wilson*, 501 U.S. at 302-03); *Moore*, 767 F. App'x at 340 (quoting *Pearson*, 850 F.3d at 534) (explaining that the inmate must make a subjective showing that "the defendants were deliberately indifferent to [his or her] medical needs.").

[63] *Davis v. Williams*, 354 F. App'x 603, 605-06 (3d Cir. 2009) (quoting *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997)); *see also Smith v. Gransden*, 553 F. App'x 173, 177 (3d Cir. 2014) (citing *Miller v. City of Phila.*, 174 F.3d 368, 374 n. 5 (3d Cir. 1999)) (explaining that "a plaintiff must show . . . a causal connection between the indifference and the plaintiff's injury."); *White*, 514 F. App'x at 261 ("Liability may be established only if two conditions (in addition to causation) are met . . .").

[64] Regardless, because "MRSA [is] a serious medical need," Warren has met the first requirement in his delay of medical care claim against CO Sanchez. *McCluskey v. Vincent*, 505 F. App'x 199, 203 (3d Cir. 2012); *see also Keller v. Cty. of Bucks*, 209 F. App'x 201, 204-07 (3d Cir. 2006); *Gallo v. Washington Cty.*, 363 F. App'x 171, 173 (3d Cir. 2010); Doc. No. 122-12 at 53 (CO Sanchez testifying that MRSA is a serious condition). MRSA is a serious medical need because "a lay person would easily recognize the necessity for a doctor's attention." *Mattern v. City of Sea Isle*, 657 F. App'x 134, 139 (3d Cir. 2016) (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). Moreover, because Warren alleges that, while he had an open wound from a prior MRSA infection, CO Stametz subjected him to re-infection with MRSA by placing him in the unsanitized cell formerly occupied by a MRSA infected inmate, for purposes of summary judgment, Warren has met the first requirement of showing that CO Stametz caused him to be "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

Warren.[65]

Deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law."[66] To act with deliberate indifference is to "recklessly disregard a substantial risk of harm."[67] "[F]inding a prison official liable for violating a prisoner's Eighth Amendment rights requires proof that the official 'knows of and disregards an excessive risk to inmate health or safety.'"[68] Thus, "to survive a summary judgment motion on this issue, [Warren] must point to some evidence . . . that [CO Sanchez or CO Stametz] knew or [were] aware of [the risk to Warren]."[69]

With regard to causation "[i]t is axiomatic that [a] § 1983 action, like its state tort analogs, employs the principles of proximate causation."[70] "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the [defendant's action] and the specific deprivation of constitutional rights at issue."[71] "Although the issue of proximate causation is typically determined by the factfinder, this issue may be addressed as a matter of law where the outcome is clear or when highly extraordinary events or conduct takes

---

[65] *See Bizzell v. Tennis*, 449 F. App'x 112, 115 (3d Cir. 2011) (citation omitted) ("Consequently, to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a *substantial* risk of serious harm; (2) the defendants' *deliberate indifference* to that risk; and (3) causation.").

[66] *Natale*, 318 F.3d at 582 (quoting *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000)).

[67] *Baker v. Younkin*, 529 F. App'x 114, 115 (3d Cir. 2013) (quoting *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009)).

[68] *Natale*, 318 F.3d at 582 (quoting *Farmer*, 511 U.S. at 837); *see also Gunter v. Twp. of Lumberton*, 535 F. App'x 144, 149 (3d Cir. 2013).

[69] *Id.* (quoting *Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 193 n.2 (3d Cir. 2001)).

[70] *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (citations and quotation omitted); *see also Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 615 (1st Cir. 2019) (Barron, J., concurring) (citations omitted) ("[I]n all § 1983 cases and Bivens actions, plaintiffs must show some causation between the defendant's conduct, the constitutional violation, and the plaintiff's injury.").

[71] *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)); *see also Ramos-Vazquez v. PrimeCare Med., Inc.*, No. 09-00364, 2010 WL 3855546, at *7 (E.D. Pa. Sept. 30, 2010).

place."[72] Therefore, if the Court determines that CO Sanchez or CO Stametz acted with deliberate indifference, the Court must then determine whether, construing the evidence in the light most favorable to Warren, a reasonable jury could find a "plausible nexus" or "affirmative link" between the deliberate indifference and the injury to Warren.

### a. CO Sanchez

CO Sanchez argues that she did not act with deliberate indifference because she did not know that Warren's blister could have been MRSA and because "Warren cannot point to evidence from which a jury could conclude that CO Sanchez knew (or should have known if the reckless indifference standard is applied) that a failure to secure immediate medical attention for Warren could lead to 'substantial and unnecessary suffering, injury, or death[.]"[73] However, the record shows disputed issues of material fact on these points.

First, Warren testified that he told CO Sanchez that his blister looked like MRSA.[74] CO Sanchez also testified that she was "trained to recognize symptoms of MRSA,"[75] that in her training she was shown pictures of MRSA, and that there were pictures of MRSA posted on the walls of the housing units.[76] Therefore, whether CO Sanchez knew or should have known that Warren's blister could have been MRSA is a disputed fact.

Second, CO Sanchez knew that MRSA is a "serious condition," which raises a disputed issue of fact as to whether she knew, or should have known, that forcing Warren to wait for

---

[72] *Brandt v. Burns*, 441 F. App'x 924, 927 (3d Cir. 2011) (citations omitted); *see also Tallman v. Barnegat Bd. of Educ.*, 43 F. App'x 490, 498–99 (3d Cir. 2002) (citations omitted) ("Although the question of proximate cause must often be submitted to the trier of fact, summary judgment is proper if the record cannot reasonably support a finding of proximate cause, and in prior § 1983 cases, [the Third Circuit has] upheld summary judgment on this basis.").

[73] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 22; *see also id.* at 19.

[74] Doc. No. 120-2 at 108:14-15 ("I told her I think I have MRSA and I showed her.").

[75] Doc. No. 122-12 at 149:10-13.

[76] *See id.* at 61:9-14.

treatment would be harmful.[77] CO Sanchez argues that because "she followed the prescribed course of action [listed on the MRSA posters] by referring [Warren] to the sick call process" she did not act recklessly by failing to secure immediate medical attention.[78] However, the MRSA posters merely told inmates to fill out sick call slips if they had MRSA symptoms; they did not state a policy that inmates could only be treated if they filled out the slips even if they were suffering a medical emergency.[79] In fact, the record details a disputed issue of fact whether filling out a sick call slip policy was mandatory for emergency medical problems[80] or skin conditions—Dr. Wilson testified that inmates did not need to fill out the sick call slip when they complained of MRSA.[81]

Therefore, viewing the facts, and drawing every reasonable inference, in the light most favorable to Warren,[82] the record shows that, despite Warren informing CO Sanchez that the blister was MRSA, and despite her training on the symptoms of MRSA and her knowledge of the seriousness of MRSA, CO Sanchez recklessly made the decision that Warren did not need immediate medical attention and told the medical staff that Warren merely had a spider bite.[83] Accordingly, Warren has pointed "to some evidence . . . that [CO Stametz] knew or [was] aware of [the risk to Warren]" yet recklessly disregarded the risk.[84]

Warren also asserts that it "is common sense that, by commencing the effective treatment

---

[77] *See id.* at 53:7-13.

[78] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 20.

[79] Doc. No. 122-21 at 1.

[80] Doc. No. 120-14 at PCM00164.

[81] Doc. No. 120-5 at 40:11-41:11, 61:10-63:4, 67:19-69:24, 71:1-11 (Dr. Wilson explaining that inmates do not need to fill out sick call slips to be seen when they are complaining of MRSA).

[82] *Hugh*, 418 F.3d at 267 (citation omitted).

[83] Doc. No. 122-12 at 118:3-22, 146:4-147:24.

[84] *Natale*, 318 F.3d at 582 (quoting *Singletary*, 266 F.3d at 193 n.2).

for Warren's MRSA one day earlier, he could have avoided some or all of the additional pain, suffering and other longer lasting consequences that he instead experienced over the next 24 hours and long thereafter."[85] In other words, had CO Sanchez brought him to the medical staff when he first complained of the MRSA, Warren argues that he would have been spared the pain he suffered between he first complained to CO Sanchez about his MRSA and when he was actually brought to the medical staff.[86]

CO Sanchez argues that Warren's argument is an "unsupported speculation" which must be supported by expert testimony.[87] However, at this stage, all that Warren needs to show is that there is a "plausible nexus" or "affirmative link" between the delay in receiving medical care and the "specific deprivation of constitutional rights at issue."[88] Taking the facts as stated by Warren as true, CO Sanchez recklessly reported to the medical staff that Warren only had a spider bite. This action directly caused the medical staff to delay treating Warren. A "natural and probable outcome" of a delay in medical treatment is an increase in the time spent in pain.[89] Therefore, Warren has presented sufficient evidence of causation.

In sum, there are disputed issues of material fact regarding whether CO Sanchez knew or should have known that Warren's blister was MRSA, whether she recklessly disregarded the risk, and whether her actions were the proximate cause of the deprivation of Warren's rights.

---

[85] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 32.

[86] *See id.* CO Sanchez argues that the difference in time was actually 15 hours as opposed to 24 hours. *See* Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 18. The Court agrees that the record indicates that the delay was approximately 15 hours.

[87] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 23.

[88] *Hedges*, 204 F.3d at 121 (quoting *Bielevicz*, 915 F.2d at 850); *see also Ramos-Vazquez*, 2010 WL 3855546, at *7.

[89] *Holt v. Navarro*, 932 A.2d 915, 921 (Pa. 2007) (citations omitted); *see also Barnes v. Anderson*, 202 F.3d 150, 158–59 (2d Cir. 1999) (stating that "state tort analogs" bear on proximate cause under § 1983 even though the issue involves federal law); *Piazza v. Lakkis*, No. 3:11-2130, 2013 WL 424724, at *3 (M.D. Pa. Feb. 4, 2013) (quoting *Milesco v. Norfolk S. Corp.*, No. 1:09-1233, 2010 WL 55331 (M.D.Pa. Jan. 5, 2010)) (applying Pennsylvania's proximate cause standard in a §1983 context).

Moreover, the Third Circuit has "explained that deliberate indifference is 'evident' in certain circumstances, including: (i) the denial of reasonable requests for medical treatment that expose the complainant to undue suffering.[90] Therefore, the Court will not grant CO Sanchez's request for summary judgment.

### b. CO Stametz

As explained above, "finding a prison official liable for violating a prisoner's Eighth Amendment rights requires proof that the official 'knows of and disregards an excessive risk to inmate health or safety.'"[91] Warren argues that CO Stametz acted with deliberate indifference because he acknowledged that "if an individual were transferred to a cell in which the prior inmate had MRSA and it was not cleaned, . . . that would be endangering that individual's life," yet still "caused or allowed Warren to be placed in [a] MRSA-infected cell."[92]

CO Stametz argues that Warren cannot prove: 1) that he was cured of MRSA and 're-infected' with MRSA"[93]; 2) that "the prior occupant of the cell was MRSA-infected"[94]; 3) that CO Stametz knew that Warren "was cured of MRSA and susceptible to re-infection"[95]; 4) that CO Stametz made the cell transfer decision; and 5) that CO Stametz did not sanitize LP's cell.[96] However, there are genuine issues of material fact regarding each of these arguments.

First, CO Stametz asserts that "Warren's testimony cannot establish that he was cured of MRSA and re-infected with MRSA" because his testimony is inadmissible hearsay evidence and

---

[90] *Mattern*, 657 F. App'x at 140 (quoting *Lanzaro*, 834 F.2d at 346); *see also Gransden*, 553 F. App'x at 177.

[91] *Natale*, 318 F.3d at 582 (quoting *Farmer*, 511 U.S. at 837); *see also Gunter*, 535 F. App'x at 149.

[92] Plaintiff's Omnibus Brief [Doc. No. 120] at 33.

[93] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 5.

[94] *Id.* at 5, 9-13.

[95] *Id.* at 9-13.

[96] *See id.* at 9-13.

because "expert testimony is required to interpret the results of diagnostic testing or render an opinion regarding an infectious disease like MRSA."[97] Plaintiff has not produced any expert opinions in this case.

However, contrary to the CO Stametz's assertion that inadmissible hearsay statements may never be considered for purposes of summary judgment,[98] "hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that 'would be admissible at trial.'"[99] Warren may present his testimony about his first-hand observations of his wound at trial. Moreover, at trial, Warren may present testimony both from the physician who he alleges cultured his wound and found that it tested negative after he returned from St. Luke's and from the physician who Warren alleges administered the later culture that showed that he had contracted MRSA again. Therefore, Warren's deposition testimony creates a disputed issue of material fact.

In addition to his deposition, Warren also presents medical records, which fall under the exceptions to the hearsay rule listed in Federal Rule of Evidence 803(4) & (6).[100] The medical records state that on August 7, 2015, Dr. Wilson informed the sheriff that Warren could attend court because "he is only over there because of his open wound."[101] This record indicates that Warren was able to be taken to court because his open wound was no longer infected with

---

[97] *Id.* at 5-6 (citing *Mitchell v. McConnell*, No. 3:06-180, 2010 WL 11527330, at *1 (W.D. Pa. Feb. 11, 2010), *subsequently affd sub nom. Mitchell v. Gershen*, 466 F. App'x 84 (3d Cir. 2011); *Hargis v. Atl. Cty. Justice Facility*, No. 10-1006, 2014 WL 1713461, at *7 (D.N.J. Apr. 28, 2014)).

[98] *Id.* at 5.

[99] *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 465-66 n.12 (3d Cir. 1989)); *see also Abdullah v. Philadelphia Hous. Auth.*, No. 99-2309, 2000 WL 377796, at *4 (E.D. Pa. Mar. 29, 2000)

[100] Fed. R. Civ. P. 803(4) & (6).

[101] Doc. No. 120-26 at PCM00564.

MRSA—the infection had dissipated and Warren's only medical issue was the still-healing open wound. CO Stametz transferred Warren to the allegedly unsanitized cell on August 17.[102] Then, on August 21, 2015, Warren's hospital records state that his culture and sensitivity "returned with +MRSA again."[103] The medical records therefore also create a disputed issue of material fact as to whether Warren was cured of his MRSA before becoming re-infected, without requiring expert testimony.

Second, CO Stametz argues that Warren's "claim inherently depends on his ability to show that the cell into which he was moved was previously occupied by a MRSA-infected inmate" but that the only evidence he presents is inadmissible hearsay evidence.[104]

However, as explained above, "hearsay evidence may be considered if the out-of-court declarant could later present the evidence through direct testimony."[105] Although Warren's deposition testimony about what LP told him is hearsay, LP could testify at trial. Therefore, Warren's deposition testimony is admissible and creates a disputed issue of material fact.

Third, CO Stametz asserts that, assuming Warren was cured and then re-infected with MRSA, he could not have been deliberately indifferent because there is no evidence that he had knowledge that "Warren had been cured of MRSA and was susceptible to being re-infected if he came into contact with a MRSA-infected person or item."[106] However, Warren testified that he told CO Stametz that he had already been cured of MRSA and that LP was actively fighting

---

[102] Doc. No. 122-7 at 5.

[103] Doc. No. 120-25 at 2.

[104] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 6-7.

[105] *J.F. Feeser*, 909 F.2d at 1542 (quoting *Williams*, 891 F.2d at 465-66 n.12); *see also Abdullah*, 2000 WL 377796, at *4.

[106] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 13.

MRSA.[107] Moreover, as mentioned above, CO Stametz testified that "if an individual were transferred to a cell in which the prior inmate had MRSA and it was not cleaned, . . . that would be endangering that individual's life."[108] Therefore, there is also a disputed issue of fact whether CO Stametz knew that Warren had been cured of MRSA and was susceptible to being re-infected.

Fourth, CO Stametz concedes that LCJ's Medical Isolation Policy establishes that the housing unit officer makes cell transfer decisions but, in his reply brief, presents an affidavit from Officer Hamm who stated that, in practice, "where the cell-to-cell moves within the medical isolation unit will impact the medical condition of inmates, the jail staff consults with the medical department, and the medical department decides how the cell-to-cell transfers will be made."[109]

However, Dr. Wilson testified that she was unaware of the medical department having anything to do with cell transfers of inmates within medical isolation.[110] It is for a jury, not the Court, to weigh Dr. Wilson's statement, which was in accordance with the stated policy, against

---

[107] Doc. No. 120-2 at 145:3-18.

[108] Plaintiff's Omnibus Brief [Doc. No. 120] at 33 (quoting Doc. No. 120-3 at 48:5-17). The Court notes that Plaintiff failed to include this page of the deposition in his exhibit. Nonetheless, considering both that CO Stametz has not challenged this statement, and the rest of the ample evidence in the deposition showing that CO Stametz understood that MRSA is highly contagious, the Court will take Plaintiff's quotation at face value.

[109] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 13 (quoting Doc. No. 122-7). This affidavit was presented for the first time in the Officer Defendants' reply brief. Warren has moved to strike this affidavit, or alternatively asks that the Court provide him the opportunity to depose Officer Hamm before the Court rules on summary judgment, arguing that, due to Officer Hamm's medical issues, the parties agreed that "Warren would forgo the deposition of Officer Hamm and preserve the ability to depose her at a later date prior to trial if the Defendants intended to call her as a witness." Plaintiff's Amended Omnibus Sur-Reply Brief [Doc. No. 130] at 15-16. Plaintiff further asserts that "[i]mplicit in the agreement to postpone her deposition, which was made to accommodate the medical needs of the defendants' witness, was an understanding that Officer Hamm's testimony would be relied upon at trial, but not summary judgment." *Id.* at 16. The Court agrees with Warren that the Officer Defendants' actions runs afoul of the principles of summary judgment. However, the Court will deny Plaintiff's motion as moot because the Court holds that Officer Hamm's affidavit merely raises issues of disputed fact.

[110] Doc. No. 120-5 at 31:3-23.

Officer Hamm's contrary assertion.[111]

Fifth, Plaintiff has testified that he was moved into the new cell directly after LP was moved out, indicating that the cell was not sanitized.[112] CO Stametz concedes that he "does not have an independent recollection of sanitizing cells on August 17."[113] However, CO Stametz argues that there is evidence that the cell was sanitized because the Medical Isolation Policy provides that every time an inmate is moved from a cell in the medical isolation unit it must be sanitized and because the Daily Log states "Rounds completed/Cell sanitizing completed."[114]

However, although the Medical Isolation Policy required sanitization, the policy does not conclusively show that the prison officials adhered to the policy—especially considering CO Stametz's argument that prison officials did not follow the stated policy when it came to cell transfers.

Furthermore, the Daily Log, which was not prepared by CO Stametz, only states generally that some cells were sanitized and that the sanitizing occurred at 19:18.[115] The Daily Log also states that LP was moved out of the cell at 19:23, after the sanitization. Although CO Stametz argues that the 19:23 entry states that it is a "late entry," these are disputed facts.[116]

In sum, there are genuine disputed material facts regarding whether Warren was cured of MRSA and then re-infected, whether LP was MRSA-infected, whether CO Stametz knew of the risk to Warren by placing him in the cell, whether CO Stametz made the decision to transfer Warren, and whether CO Stametz sanitized the cell. Because Warren has "point[ed] to some

---

[111] *See Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n. 1 (3d Cir. 1995).

[112] Doc. No. 122-4 at 149:3-18.

[113] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 11.

[114] Doc. No. 122-7 (Addendum B).

[115] *See id.*

[116] *See id.*

evidence" showing that CO Stametz "knew or [was] aware of [the risk to Warren]"[117] but acted with "reckless disregard" by placing him in the cell, summary judgment is not warranted on the issue of deliberate indifference.[118]

CO Stametz also argues that summary judgment must be granted because "whether an inmate contracted MRSA as a proximate result of prison conditions cannot be inferred in the absence of expert medical testimony" and "Warren has not presented expert medical testimony to establish a causal connection between his placement in LP's cell and his re-infection with MRSA."[119]

However, Warren has demonstrated a "plausible nexus" or "affirmative link" between CO Stametz transferring Warren and his re-infection with MRSA.[120] As explained above, Warren has presented medical records indicating that his MRSA infection had been cured before he was transferred to the new cell, and that after his transfer, his infection returned.[121] An "ordinary person," with knowledge that Warren was recovering from MRSA, would have "foreseen" the re-infection "as the natural and probable outcome" of transferring Warren to an unsanitized cell formerly occupied by a prisoner with MRSA.[122] Thus, Warren has produced sufficient evidence of proximate causation to survive summary judgment without expert testimony.[123] Accordingly, CO Stametz's motion for summary judgment on Warren's federal

---

[117] *Natale*, 318 F.3d at 582 (quoting *Farmer*, 511 U.S. at 837).

[118] *Baker*, 529 F. App'x at 115 (quoting *Giles*, 571 F.3d at 330).

[119] Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 7-8.

[120] *Hedges*, 204 F.3d at 121 (quoting *Bielevicz*, 915 F.2d at 850); *see also Ramos-Vazquez*, 2010 WL 3855546, at *7.

[121] Doc. Nos. 120-25 at 2 & 120-26 at PCM00564.

[122] *Holt*, 932 A.2d at 921 (citations omitted); *see also Piazza*, 2013 WL 424724, at *3 (quoting *Milesco*, 2010 WL 55331).

[123] CO Stametz cites several cases where district courts within this Circuit were unable to determine causation for a prisoner's MRSA infection without expert witness testimony. *See* Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 7-8 (citing *Edwards v. Northampton Cty.*, 2016 WL 7654661 at *5, *aff'd* 663 Fed. Appx. 132 (3d Cir. 2016); *Hargis*, 2014 WL 1713461 at *8; *Texter v. Merlina*, 2008 WL 545032 at *1 (M.D. Pa.);

claims will be denied.

### 3. Whether Warren's state tort claims against Officers Stametz and Sanchez are barred by the Pennsylvania Tort Claims Act

Warren also asserted state law tort claims against the Officer Defendants for negligence and negligent infliction of emotional distress. The Officer Defendants moved to dismiss these claims on the theory that they are barred by the Pennsylvania Tort Claims Act.

Under the Tort Claims Act, individual officers are immune to the same extent that their employing entity is immune.[124] "This immunity is abrogated, with respect to individuals only, for conduct constituting a crime, actual fraud, actual malice or willful misconduct."[125] "[T]o prove willful misconduct, it must be shown that the actor desired to bring about the result that followed, or at least it was substantially certain to follow."[126] "'Willful misconduct' in this context 'has the same meaning as the term 'intentional tort.'"[127] Therefore, "even where a public employee acts with a degree of culpability equivalent to 'recklessness,' Pennsylvania law nevertheless affords him immunity."[128] For this reason, "evidence which demonstrates deliberate indifference fails to establish the type of willful misconduct necessary to pierce [Tort Claims

---

*Shaver v. CFG Healthcare*, 2011 WL 3882287 at *7 (D.N.J.)). However, *Edwards*, *Hargis*, and *Shaver* all alleged that the general dirty conditions of the prisoner's cell caused his MRSA infection (and *Texter* does not involve MRSA). Those cases are distinguishable because there is a significantly stronger affirmative link when there is a documented allegation that a prisoner with a still open wound from a recently cured MRSA infection was placed in an unsanitized cell formerly occupied by a prisoner with an active MRSA infection.

[124] *See* 42 Pa.C.S. § 8545.

[125] *Robbins v. Cumberland Cty. Children & Youth Servs.*, 802 A.2d 1239, 1252 (Pa. Commw. Ct. 2002) (citing *Diaz v. Houck*, 632 A.2d 1081, 1085 (1993); 42 Pa.C.S. § 8550).

[126] *Diaz*, 632 A.2d at 1084-85.

[127] *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001) (citing *Delate v. Kolle*, 667 A.2d 1218, 1221 (Pa. Commw. Ct. 1995)).

[128] *Bright v. Westmoreland Cty.*, 443 F.3d 276, 287 (3d Cir. 2006) (quoting *Williams v. City of Philadelphia*, 569 A.2d 419, 421–22 (Pa. Commw. Ct. 1995)).

Act] immunity."[129]

Although Officers Sanchez and Stametz are not entitled to summary judgment on deliberate indifference because they acted with "reckless[] disregard [for] a substantial risk of harm,"[130] their actions did not rise to the level of an intentional tort under Pennsylvania law.

Warren asserts that CO Sanchez demonstrated willful misconduct because she testified that she "did not believe that Warren needed immediate medical attention" and that she "would have taken appropriate steps to ensure that he received it" if she thought that medical attention was needed.[131] However, viewing the facts in the light most favorable to Warren, this testimony demonstrates that Officer Sanchez acted recklessly in making a decision that she was unqualified and unauthorized to make—not that she intended for Warren to suffer from MRSA or was substantially certain it would occur.

Likewise, Warren argues that CO Stametz demonstrated willful misconduct because "[d]espite Warren's repeated objections and explanation that he was negative for MRSA, that his wound had not yet healed, and that he could contract MRSA from the other inmate if moved into the cell with him, Stametz insisted that Warren be moved and did not clean the cell prior to transfer."[132] However, again, this demonstrates that CO Stametz acted with deliberate indifference—not that he intended that Warren become re-infected with MRSA or that he was substantially certain that would occur.

---

[129] *Vicky M. v. Ne. Educ. Intermediate Unit*, 689 F. Supp. 2d 721, 741 (M.D. Pa. 2009) (citing *Bright*, 443 F.3d 276, 287); *see also M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) ("This level of culpability is even higher than that required to state a plausible § 1983 claim."); *Owens v. City of Philadelphia*, 6 F. Supp. 2d 373, 395 (E.D. Pa. 1998) ("The record would permit a reasonable fact-finder to reach the conclusion that the officers acted with "deliberate indifference"—as used in the federal constitutional cases—but that is a standard which falls short of intent to cause harm[.]").

[130] *Baker*, 529 F. App'x at 115 (quoting *Giles*, 571 F.3d at 330).

[131] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 40 (quoting Doc. No. 120-33 at 2).

[132] *Id.* at 40 (citing Doc. No. 120-2 at 145:3-6).

Warren's "evidence must create a material question of fact that [Officers Stametz and Sanchez] intended" the harm suffered by Warren, "or that they must have been substantially certain it would occur."[133] Warren has failed to do so. Therefore, summary judgment will be granted on the state claims against Officers Stametz and Sanchez.

## B. PrimeCare Defendants

Warren's medical malpractice claims against the PrimeCare Defendants stem from his allegations that PrimeCare improperly failed to treat him when he first complained of MRSA, neglected to take a MRSA culture once he was brought to the medical unit, and that Dr. Wilson's method of packing, performed by her and by the nurses whom she instructed, was malpractice.[134]

The PrimeCare Defendants' sole ground for summary judgment is premised on Plaintiff's failure to produce expert reports.[135] The PrimeCare Defendants assert that "Plaintiff cannot demonstrate a viable cause of action against the PrimeCare Medical Defendants, because he has failed to satisfy the expert testimony requirement of his medical malpractice claims."[136]

"Under Pennsylvania law, medical malpractice is 'broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services.'"[137] In order to prevail on a medical malpractice claim under Pennsylvania law, a plaintiff has the burden of establishing each of the following elements: (1) that there was a duty owed by the physician; (2) that there was a breach of that duty; (3) that the breach proximately

---

[133] *Vicky M.*, 689 F. Supp. 2d at 741.

[134] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 41, 43.

[135] PrimeCare Defendants Motion for Summary Judgment [Doc. No. 109] at 3.

[136] *Id.*

[137] *Brown v. Hahnemann Univ. Hosp.*, 20 F. Supp. 3d 538, 542 (E.D. Pa. 2014) (quoting *Toogood v. Owen J. Rogal, D.D.S., P. C.*, 824 A.2d 1140, 1145 (Pa. 2003)).

caused the harm experienced by the plaintiff; and (4) that the plaintiff's damages directly resulted from the harm.[138]

Additionally, "a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury."[139] "A very narrow exception to the requirement of expert testimony in medical malpractice actions applies 'where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons.'"[140]

The Pennsylvania Supreme Court has explained that this exception must be "carefully limited," because "to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury."[141] "In other words, it is not enough to establish that a medical provider made a mistake, or that an injury occurred."[142] Rather "to hold a physician liable, the burden is upon the plaintiff to show that the physician failed to employ the

---

[138] *See Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1070 (Pa. 2006) (quoting *Hightower-Warren v. Silk*, 548 Pa. 459, 698 A.2d 52, 54 (Pa. 1997)).

[139] *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. 2005) (quoting *Toogood*, 824 A.2d at 1145); *see also Hakeem v. Salaam*, 260 F. App'x 432, 434 (3d Cir. 2008) (citing *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990) ("In order to establish medical malpractice under Pennsylvania law, a plaintiff must present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from accepted medical standards, and that such deviation was the proximate cause of the harm suffered.")); *Mitchell v. Shikora*, 209 A.3d 307, 315 (Pa. 2019) ("A plaintiff in a medical negligence matter is required to present an expert witness who will testify, to a reasonable degree of medical certainty, regarding the standard of care (duty); that the acts of the physician deviated from the standard or care (breach); and that such deviation was the proximate cause of the harm suffered."); *Quinby*, 907 A.2d at 1071 ("With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation.").

[140] *Toogood*, 824 A.2d at 1145 n.14 (citing *Chandler v. Cook*, 265 A.2d 794, 796 n. * (Pa. 1970)).

[141] *Id.* at 1149.

[142] *Brown*, 20 F. Supp. 3d at 543 (citing *Toogood*, 824 A.2d at 1149).

requisite degree of care and skill."[143] "A plaintiff can do that without expert testimony only when the physician's failure is clear even to a non-professional."[144] One example provided by the Pennsylvania Supreme Court is "where a gauze pad is left inside a patient's body."[145] "When, as here, both the standard of care and causation are at issue, the defendant's lack of skill or care and the causal relationship must be obvious."[146]

Warren did not provide expert reports but asserts that his medical malpractice claims fit into the narrow exception because it is both obvious that the PrimeCare Defendants violated the standard of care and that the PrimeCare Defendants' actions caused Warren's injuries.[147]

Here, it is not obvious that the PrimeCare Defendants violated the applicable standard of care. Viewing the facts in the light most favorable to Warren, PrimeCare's failure to initially treat Warren when the medical unit was informed only that he had a spider bite, its failure to take a MRSA culture even though Warren was diagnosed only with cellulitis, and Dr. Wilson's method of packing can, at best, establish that the PrimeCare Defendants made mistakes—an expert is needed to determine whether these actions rose to the level of a violation of the

---

[143] *Toogood*, 824 A.2d at 1150 (citations omitted).

[144] *Brown*, 20 F. Supp. 3d at 543.

[145] *Brady v. Urbas*, 111 A.3d 1155, 1162 n.6 (Pa. 2015) (citation omitted).

[146] *Brown*, 20 F. Supp. 3d at 543 (citing *Grossman*, 868 A.2d at 567).

[147] *See* Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 42-44, 47-48. Plaintiff also asserts that the PrimeCare Defendants acted intentionally or with deliberate indifference, and that "[c]ourts have held that expert testimony is not required in cases of deliberate indifference to an inmate's serious medical needs." *Id.* at 44 (citing *Petrichko v. Kurtz*, 117 F. Supp. 2d 467, 471 (E.D. Pa. 2000); *Wise v. Wash. Cty.*, No. 10-1677, 2015 WL 1757730, at *29 (W.D. Pa. Apr. 17, 2015); *McCabe v. Prison Health Servs.*, 117 F. Supp. 2d 443, 452 (E.D. Pa. 1997)). However, all three of those cases were Eighth Amendment deliberate indifference cases, not medical malpractice cases under Pennsylvania law. Plaintiff further asserts that "no expert testimony is required where the defendant's conduct amounts to battery." Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 44 (citing *Grabowski v. Quigley*, 684 A.2d 610, 615–16 (Pa Super. 1996); *Brownstein v. Gieda*, No. 3:08CV1634, 2009 WL 2513778, at *6 (M.D. Pa. Aug. 13, 2009)). However, in Judge Davis's Order on the Motion to Dismiss, only the state law claims for negligence and negligent infliction of emotional distress against the PrimeCare Defendants were allowed to proceed. *See* Doc. No. 67 at 24. Therefore, neither Plaintiff's theory of deliberate indifference nor its theory of battery suffices to excuse its failure to present expert reports.

"requisite degree of care and skill."[148]

Recognizing this, Warren instead asserts that expert testimony is unnecessary to establish the standard of care because the PrimeCare Defendants violated their own procedures by failing to initially see him and failing to culture his wound and that PrimeCare's "failure to follow its own procedures governing control of a highly contagious and infectious disease is such an 'obvious' want of care that no expert testimony is required to establish it."[149]

Even assuming that the violation of an internal policy and procedure is encompassed within the "very narrow exception,"[150] the evidence does not support Warren's assertion that the PrimeCare Defendants violated internal policies and procedures. Warren alleges that PrimeCare's failure to initially see him violated PrimeCare's policies and procedures because the CDC MRSA Fact Sheet "specifically required that inmates 'always' receive 'medical attention' when they exhibit these symptoms."[151] However, the CDC MRSA Fact Sheet is a document that was not prepared by PrimeCare and, although Warren alleges that PrimeCare provided him with the Fact Sheet during his medical intake,[152] there is nothing to suggest that PrimeCare treated the material as its own policy. A larger issue with Warren's assertion, though, is that the Fact Sheet

---

[148] *Toogood*, 824 A.2d at 1150.

[149] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 43.

[150] *Toogood*, 824 A.2d at 1145 (citing *Hightower-Warren*, 698 A.2d at 54 n. 1). Plaintiff cites to *Brannan v. Lankenau Hospital*, where the Pennsylvania Supreme Court held that "the staff's failure to notify the attending physician of the deteriorating condition of one his patients fell within the exception to the requirement of expert testimony, because that failure violated the hospital's standard practices and procedures and explicit instructions." Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 42 (citing 417 A.2d 196, 201 (Pa. 1980)). However, while the "want of care [is] so obvious" when a hospital staff fails to inform a doctor that the condition of one of his patients was deteriorating, PrimeCare's alleged lack of care—the nurse's failure to immediately see Warren after a non-medical staff member informed her that Warren had a spider bite and PrimeCare's failure to take a MRSA culture after Warren's blister was diagnosed as cellulitis—is not as obvious. *See Brannan*, 417 A.2d at 201. Regardless, the Court concludes that the record does not support Plaintiff's assertion that the PrimeCare Defendants violated any internal policies or procedures.

[151] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 42.

[152] *See id.* at 6.

does not say what Warren claims it says. The Fact Sheet instructs people who believe they may be infected to "seek medical attention."[153] Nowhere does the Fact Sheet set out a requirement that inmates *receive* immediate medical attention, and it certainly does not state a *PrimeCare* policy that such inmates always receive immediate medical attention, especially when they have been told that the prisoner has a spider bite.[154]

Warren's assertion that PrimeCare violated its own policy by not taking a MRSA culture is also not supported by the record. The extent of Warren's support for this assertion is Dr. Wilson's deposition.[155] The relevant portion of Dr. Wilson's testimony, though, only establishes *how* a MRSA infection is diagnosed ("in general a culture should be obtained from the infection site and sent to the microbiology laboratory"[156]), not that PrimeCare was required to take a culture every time a prisoner complained of MRSA. Nor does this testimony establish that when the medical staff diagnoses a condition as cellulitis—and not MRSA—a MRSA culture must still be taken. Therefore, the record belies Warren's assertion that PrimeCare violated a policy "which eliminated any professional judgment or discretion."[157]

Expert testimony is necessary here because "a jury of laypersons generally lacks the

---

[153] Doc. No. 120-11 at PCM00637.

[154] The Officer Defendants' assert this same argument about the Fact Sheet. *See* Officer Defendants' Brief in Support of Summary Judgment [Doc. No. 122] at 19-20. Warren also alleges that PrimeCare's "representative conceded at its deposition that examination and treatment were required under these circumstances." Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 42-43 (citing Doc. No. 120-7 at 93:8-12). However, although Plaintiff cites to page 93 in Exhibit 6, the attached Exhibit 6 does not include page 93 of the deposition of Thomas Weber. *See* Exhibit 6. Warren also cites to several other parts of the record for his proposition that PrimeCare violated its own policies and procedures. *See* Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 42-43 (citing Doc. No. 120-7 at 62:22-63:6; Doc. No. 120-5 at 39:8-21). However, these references do not show that PrimeCare violated any policy or procedure—rather, both references indicate that PrimeCare exercised discretion in its treatment. *See* Doc. No. 120-7 at 63:21-24 ("If someone comes with complaints and there is an abnormality observed they should be followed. I will go that far, but I don't know treatment may or may not be necessary"); Doc. No. 120-5 at 40:15-18 (Dr. Wilson explaining that PrimeCare tries to see all skin complaints immediately).

[155] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 43.

[156] Doc. No. 120-5 at 38:24-39:20.

[157] Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 43.

knowledge to determine" whether PrimeCare's actions breached the applicable standard of care.[158] This is not a case that is obvious like when "a gauze pad is left inside a patient's body"[159] or when a quadriplegic falls off a hospital bed.[160] Whether PrimeCare breached the applicable standard of care—by failing to immediately see an inmate who, they were informed, had a spider bite, by not taking a MRSA culture after diagnosing Warren only with cellulitis, or by improperly packing Warren's wound—are issues that are not obvious to a lay jury.[161]

In sum, under Pennsylvania law, a plaintiff in a medical malpractice case must present expert testimony on the issues of the applicable standard of care and causation unless the facts fall into the very narrow exception where it is so obvious that even a lay jury can determine that the defendant violated the standard of care and that the defendant's actions caused the plaintiff's injuries. Warren has failed to present expert testimony, and it is not obvious whether PrimeCare violated the applicable standard of care. "Without a medical expert, [Warren cannot] create a genuine issue for trial on this claim. Therefore, [the Court] conclude[s] that summary judgment [is] proper."[162]

---

[158] *Toogood*, 824 A.2d at 1149.

[159] *Brady*, 111 A.3d at 1162 n.6.

[160] *Quinby*, 907 A.2d at 1072.

[161] *See Brown*, 20 F. Supp. 3d at 543.

[162] *Hakeem*, 260 F. App'x at 434 (citing *Celotex*, 477 U.S. at 322–23). Warren asserts that because of "Defendants' experts' cost-prohibitive fee schedules, and the experts' refusal to reduce their fees in light of the nature of this litigation, Warren has been unable to depose Defendants' experts." Plaintiff's Omnibus Brief in Opposition [Doc. No. 120] at 48-49. Therefore, Warren requests that "[i]n the event that the Court is considering granting summary judgment . . . the Court should not do so without, at least, allowing Warren to take these depositions." *Id.* at 49. However, accepting that the PrimeCare Defendants' experts charged prohibitive hourly rates, Plaintiff was not required to depose those experts. As the PrimeCare Defendants correctly point out, at this stage of litigation, Plaintiff, who was represented by able volunteer counsel, was required to produce his own expert testimony on the issues of the standard of care and causation. *See* PrimeCare Defendant's Brief in Support of Summary Judgment [Doc. No. 121] at 16-17. Plaintiff has not produced such expert testimony or informed the Court of any efforts to secure his own experts. Moreover, the Court notes that Plaintiff never sought relief from the Court on this issue. The Court acknowledges the challenges attendant to finding volunteer counsel for prisoner civil rights plaintiffs and appreciates the attorneys who choose to serve on the Prisoner Civil Rights Panel. *See* Prisoner Civil Rights Panel Program Description, https://www.paed.uscourts.gov/documents/probono2/cvpnldes.pdf. However, with participation in the Program comes responsibilities. Attorneys cannot decline to retain experts, provide no notice to

## IV.    CONCLUSION

For the foregoing reasons, Defendants Stametz and Sanchez's motion for summary judgment is granted in part and denied in part and Defendants PrimeCare and Wilson's motion for summary is granted.

---

the Court, and then, in response to a dispositive motion, ask the Court to stay its opinion on the dispositive motion if the Court determines that expert testimony is necessary, without providing any explanation for the failure to obtain its own expert testimony. The Court further notes that the Program includes a fund that counsel may apply for reimbursement of expert costs. *See* Public Interest Civil Litigation Fund Guidelines, https://www.paed.uscourts.gov/documents/probono2/frmreimb.pdf. Plaintiff has failed to make use of the fund or provide an explanation as to why the fund did not allow Plaintiff to obtain expert testimony. Therefore, the Court denies Plaintiff's request.